## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ROME DIVISION

| | | |
|---|---|---|
| COOSA RIVER BASIN INITIATIVE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 4:24-cv-00068-WMR |
| | ) | |
| CITY OF CALHOUN, GEORGIA, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

## FINAL CONSENT DECREE AS TO DEFENDANT CITY OF CALHOUN, GEORGIA

### I.    RECITALS

**WHEREAS**, Plaintiff Coosa River Basin Initiative ("Plaintiff" or "CRBI") is a Georgia nonprofit member organization based in Rome, Georgia, dedicated to the protection, preservation, and restoration of the Upper Coosa River Basin, one of North America's most biologically diverse river systems, including the Coosawattee River and connected waters;

**WHEREAS**, Defendant City of Calhoun, Georgia ("Calhoun" or "the City") is a Georgia municipality that owns and operates the Calhoun Water Pollution Control Plant ("WPCP") pursuant to the terms and conditions of National Pollutant Discharge Elimination System ("NPDES") Permit No. GA0030333. The Calhoun WPCP generates sludge/biosolids ("biosolids") as a byproduct of wastewater treatment operations;

**WHEREAS,** Calhoun WPCP Significant Industrial Users, almost all of which are carpet-manufacturing and related facilities, have for decades discharged per- and polyfluoroalkyl substances ("PFAS") in industrial wastewater to the Calhoun WPCP unbeknownst to Calhoun until relatively recently, which utilizes conventional wastewater treatment that is unable to remove PFAS from wastewater and these environmentally persistent and toxic substances have accumulated in and contaminated the biosolids generated by the WPCP;

**WHEREAS**, since the mid-1990s, the Calhoun WPCP has disposed or arranged for the disposal of biosolids, which contained significant amounts of PFAS-contaminants through land application at numerous disposal sites identified in the City's NPDES Permit applications throughout Calhoun and Gordon County, Georgia. Between 2002 and 2022, Calhoun, in accordance with its permits with Georgia EPD, disposed of approximately 40,000 dry tons of these biosolids at multiple locations in Gordon County, including in close proximity to Calhoun's Mauldin Road Water Treatment Plant ("WTP") and Brittany Drive WTP as well as private groundwater based drinking water sources;

**WHEREAS,** on April 10, 2024, the U.S. Environmental Protection Agency ("EPA"), based on its review of the best available health effects data and its determination that PFAS are toxic to human health in drinking water, issued a final rule establishing legally enforceable limits or Maximum Contaminant Levels

("MCLs") for certain PFAS compounds in public drinking water systems, including individual MCLs for five PFAS including PFOA, PFOS, PFHxS and PFNA, and a Hazard Index MCL for mixtures containing two or more of PFHxS, PFNA, PFBS, and HFPO-DA (commonly known as GenX chemicals);

**WHEREAS,** effective July 8, 2024, the EPA—after considering the significant evidence of adverse effects to human health and the environment caused by PFOA and PFOS, their persistence and mobility in the environment, and the significant potential for human exposure—concluded that these chemicals may present a substantial danger to public health or welfare or the environment and designated PFOA and PFOS, including their salts and structural isomers, as hazardous substances under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), commonly known as Superfund;

**WHEREAS,** CRBI has members (a) who own property and/or reside near the Coosawattee River and Sludge Field 11 (further defined herein), (b) who swim, fish, and otherwise recreate in the Coosawattee River and other waters downstream of Sludge Field 11, (c) who rely on and consume drinking water from the City of Calhoun's public drinking water treatment plants, which use water from the Coosawattee River and onsite groundwater wells and springs as the source of these members' domestic water supplies, and (d) who rely on private groundwater wells and springs;

**WHEREAS**, on March 7, 2024, CRBI filed a Complaint against Calhoun and Moss Land Company, LLC (owner of real property defined further below as Sludge Field 11) in the United States District Court for the Northern District of Georgia, alleging, *inter alia*: that Calhoun's disposal of these PFAS-contaminated biosolids at Sludge Field 11 resulted in the unpermitted and ongoing discharge of dangerously high levels of PFAS to the Coosawattee River in violation of Section 301 of the CWA, 33 U.S.C. § 1311; that Calhoun's failure to prevent the PFAS-contamination of WPCP biosolids and the City's disposal of the same throughout Gordon County, as well as the City's illegal discharges of PFAS to the Coosawattee River, violated the terms and conditions of Calhoun's NPDES Permit in violation of the CWA; and that Calhoun's past or present generation, handling, storage, treatment, transportation, and/or disposal of these PFAS-contaminated biosolids throughout Gordon County may present an imminent and substantial endangerment to health or the environment in violation of Section 7002(a)(1)(B) of RCRA, 42 U.S.C. § 6972(a)(1)(B), because, among other things, they caused the contamination of finished drinking water at both the Mauldin Road and the Brittany Drive WTPs as well as groundwater sourced private residential drinking water wells and springs with dangerous levels of toxic PFAS (the "Litigation");

**WHEREAS,** Calhoun denies all such allegations and alleged violations and admits no liability, fault, or wrongdoing arising out of Plaintiff's allegations in the Litigation;

**WHEREAS,** Calhoun contends that it has met all existing standards for the land application of WPCP biosolids, which EPA acknowledges has been practiced for decades and, under appropriate circumstances, continues to be a common method for beneficial reuse of biosolids in that they can provide soil enrichment and supplement and/or replace commercial fertilizers;

**WHEREAS,** despite Calhoun's position as to CRBI's claims, Calhoun agrees to the injunctive relief and other terms and conditions set forth herein in an effort to promote the health, safety, and welfare of its citizens;

**WHEREAS**, CRBI and Calhoun (the "Parties"), in consultation with counsel, hereby agree to resolve the Litigation and any issues that arose or could have arisen in connection with the Litigation as between the Parties in accordance with this Consent Decree, believing that settling the issues without further litigation through a Consent Decree is the most appropriate means of resolving the issues;

**WHEREAS**, a copy of this proposed Consent Decree was received by the Attorney General of the United States and the EPA Administrator more than forty-five (45) days before entry of the Consent Decree by the Court as required by 33 U.S.C. § 1365(c)(3); and

**WHEREAS**, CRBI and Calhoun recognize, and the Court by entering this Consent Decree finds, that this Consent Decree has been negotiated by the Parties in good faith and will avoid further litigation between the Parties and that this Consent Decree is fair, reasonable, and in the public interest.

**NOW THEREFORE, WITHOUT THE TRIAL OR ADJUDICATION OF ANY ISSUE OF FACT OR LAW AND WITHOUT ADMISSION BY DEFENDANT CALHOUN OF ANY VIOLATIONS OR WRONGDOING, AND UPON CONSENT AND AGREEMENT OF THE PARTIES, IT IS HEREBY ORDERED, ADJUDGED AND DECREED AS FOLLOWS:**

## II.    JURISIDICTION

1.  This Court has subject matter jurisdiction over the Parties and subject matter of the Litigation pursuant to Section 505(a) of the CWA, 33 U.S.C. § 1365(a), Section 7002(a)(1)(B) of RCRA, 42 U.S.C. § 6972(a)(1)(B), and 28 U.S.C. § 1331.

2.  For purposes of entry of this Consent Decree and any action to enforce this Consent Decree, Calhoun consents to this Court's jurisdiction under 33 U.S.C. § 1365(a).

3.  Venue is proper in the Northern District of Georgia pursuant to 33 U.S.C. § 1365(c)(1) and 28 U.S.C. § 1391(b).

## III.    DEFINITIONS

4.  Capitalized terms used herein but not otherwise defined shall have the meaning as defined in the Clean Water Act, the Resource Conservation and Recovery Act, or their implementing regulations.

5.  "Brittany Drive Water Treatment Plant" or "Brittany Drive WTP" means the water treatment facility located off of Campbell Road in Calhoun that withdraws water from certain groundwater wells and natural spring source(s) to be treated and distributed throughout the Eastern one-half of Gordon County, Georgia.

6.  "Calhoun Water Pollution Control Plant" or "the WPCP" means the City of Calhoun's wastewater treatment plant owned and operated by the City pursuant to the terms and conditions of National Pollutant Discharge Elimination System ("NPDES") Permit No. GA0030333.

7.  "Effective Date" means the date that this Consent Decree is entered by the Court.

8.  "EPA" means the U.S. Environmental Protection Agency.

9.  "EPD" means the Environmental Protection Division of the Georgia Department of Natural Resources.

10. "GAC" means Granular Activated Carbon.

11. "Mauldin Road Water Treatment Plant" or "Mauldin Road WTP" means the water treatment facility located at 500 Mauldin Road Northwest in Calhoun that withdraws water from the Coosawattee River to be treated and distributed throughout the Western one-half of Gordon County, Georgia.

12. "Maximum Contaminant Level" or "MCL" means the legal threshold limits of the concentration of a substance that is allowed in public drinking water systems

under the Safe Drinking Water Act and the National Primary Drinking Water Regulations, as set by EPA.

13. "PFAS" means per- and polyfluoroalkyl substances.

14. "PFOA" means Perfluorooctanoic acid or such other chemical definition recognized by EPA.

15. "PFOS" means Perfluorooctane sulfonic acid or such other chemical definition recognized by EPA.

16. "PFNA" means Perfluorononanoic acid or such other chemical definition recognized by EPA.

17. **"PFHxS"** means Perfluorohexane sulfonic acid or such other chemical definition recognized by EPA.

18. "PFBS" means Perfluorobutane sulfonic acid or such other chemical definition recognized by EPA.

19. "Sludge Field 11" means three large parcels of real property in Gordon County, Georgia that contain twelve land application sites identified in the City of Calhoun's NPDES permit applications designated as Field IDs 11-01 through 11-12, and including: Gordon County Parcel No. 064 001, which has approximately 883 acres containing Field IDs 11-1, 11-2, and 11-11; Parcel No. 064 033, which has 212.41 acres containing Field IDs 11-8, 11-9, and 11-10; and Parcel No. 063 028, which has 1,117 acres containing Field IDs 11-3, 11-4, 11-5, 11-6, 11-7, and 11-12.

Sludge Field 11 is located a short distance upstream from Calhoun's Mauldin Road Water Treatment Plant drinking water intake on the Coosawattee River.[1]

## IV.    INJUNCTIVE RELIEF

20. **Third-Party Monitor.** Within thirty (30) days of the Effective Date, the Parties will designate a Third-Party Monitor ("Monitor") with environmental engineering experience and expertise, including PFAS sampling and analysis and municipal wastewater treatment operations, to oversee, administer, and certify Calhoun's compliance with the terms and conditions of, and the City's obligations under, this Consent Decree as more fully set out herein, including the injunctive relief imposed herein. Calhoun's obligations under this Consent Decree are imposed independent of the designation of the Monitor and/or the Monitor's performance of its responsibilities as set forth herein. The dispute resolution provisions in Section VII herein shall govern if the Parties do not agree on designation of a Monitor, and the Court may designate a Monitor for good cause shown following consideration of proposals from each of the Parties.

a.    In performing the duties and responsibilities set forth herein, the Monitor shall coordinate with both Plaintiff and Calhoun and may, in its reasonable discretion and with prior notice to the Parties, engage representatives of the Parties

---

[1] *See* Map attached as <u>Attachment 1</u> and incorporated by reference herein.

or third parties to assist or perform certain duties or functions to secure the just, speedy, efficient, and cost-effective means of achieving the remedial objectives and injunctive relief set forth herein.

      b.    Calhoun shall be solely responsible for fees and expenses incurred by the Monitor in performing the duties set forth in this Consent Decree and Calhoun's prompt payment of all such fees and expenses shall in no way be withheld or otherwise impacted by any determination made by the Monitor in performance of said duties. By mutual written agreement of the Parties, the Parties may elect to terminate and replace the Monitor by twenty (20) days advance written notice to the then-serving Monitor, whose replacement shall assume the duties and responsibilities of the Monitor as set forth herein.

      c.    In certifying Calhoun's compliance with this Consent Decree, the Monitor shall, at least annually, deliver to both Parties a written certification or detailed summary of the basis for any deficiencies or failures to comply. The Monitor shall report material deficiencies as they arise so that they can be promptly rectified.

      d.    ***Monitor Term.*** The Monitor's term shall be three (3) years from the Effective Date. In the event the Monitor completes all duties, responsibilities, and deliverables under this Consent Decree in a period of less than three (3) years, the Monitor's term can, by agreement of the Parties, be terminated prior to the expiration

of three (3) years from the Effective Date. In no event shall the expiration of the Monitor's term in any way relieve Calhoun from the obligations imposed on the City by this Consent Decree, including those imposed as injunctive relief herein. Calhoun shall, at its sole option, agree to continuation of the Monitor's term beyond 3 years from the Effective Date by written notice to CRBI. The Monitor term may be extended or reopened by the District Court upon Motion by any Party for good cause shown.

21. **Cessation of Land Application of Calhoun WPCP Biosolids.** As of the Effective Date, Calhoun shall cease any and all land application of biosolids generated by the Calhoun WPCP and divert all such biosolids for disposal at a permitted (1) solid waste disposal facility with a leachate collection system and liner and/or (2) hazardous waste disposal or treatment facility reasonably approved by CRBI and the Monitor, until such time that sampling and analysis of biosolids generated by the Calhoun WPCP confirms that the PFAS content in WPCP sludge meets EPA's Maximum Contaminant Levels for PFAS, or equivalent concentrations of PFAS as measured in sludge/biosolids. Calhoun shall permanently cease land application of biosolids generated by the Calhoun WPCP, regardless of PFAS content, on properties located within one mile of (1) the Coosawattee River or (2) the groundwater wells or spring(s) providing source water to the Brittany Drive WTP.

22. **Implementation of Drinking Water Treatment Upgrades/Modifications.**
As of the Effective Date, in keeping with the Calhoun Water Department's Mission
"To provide clean, pure drinking water to customers and to protect health," Calhoun
shall continue to implement emergency treatment upgrades and/or modifications,
including but not limited to GAC filtration, at both the Mauldin Road WTP and
Brittany Drive WTP as necessary to reduce PFAS concentrations in finished
drinking water to the maximum extent practicable, including to comply with EPA's
PFAS MCLs. The City shall also investigate, evaluate, and pursue permanent
treatment upgrades and/or modifications at both the Mauldin Road WTP and
Brittany Drive WTP so that all finished drinking water will fully comply with the
PFAS MCLs. Prior to the implementation of any such permanent treatment upgrades
and/or modifications, Calhoun shall, on at least a monthly basis, publish
representative results on the City's website of PFAS sampling and analysis of
finished drinking water from both the Mauldin Road WTP and Brittany Drive WTP
and indicate whether or not the City's finished drinking water complies with the
PFAS MCLs. This sampling, analysis and reporting should include, at minimum,
PFOA, PFOS, PFNA, PFHxS and PFBS.

23. **Recovery of Relief from Third Parties.** Calhoun shall vigorously pursue
relief from the PFAS chemical manufacturers and chemical applicators in the lawsuit
styled *Moss Land Company, LLC, et al. v. City of Calhoun, Georgia, et al.,* Superior

Court of Gordon County, State of Georgia, Civil Action File No. 24CV73929, and/or other litigation that may arise, including to recover as part of any damages from such third parties costs reasonably necessary to:

a.   Evaluate and implement remedial measures, including but not limited to diversion and treatment, in order to reduce or eliminate discharges of PFAS from Sludge Field 11 to the Coosawattee River;

b.   Upgrade, retrofit, modify, or design, install and maintain water treatment technology at the Mauldin Road WTP and Brittany Drive WTP necessary to reduce PFAS concentrations in finished drinking water to comply with applicable MCLs; and

c.   Calhoun shall comply with the duties and obligations under this Consent Decree irrespective of any relief sought or obtained by Calhoun from third parties in any other litigation, and irrespective of any recovery by Calhoun of costs incurred in order to comply with the injunctive relief imposed on the City under this Consent Decree, including the Monitor's fees and expenses, the PFAS WPCP Investigation, the Residential Well Remedial Actions, or other relief set forth in this Consent Decree.

24. **Calhoun PFAS WPCP Investigation.** Calhoun shall engage in a PFAS WPCP sampling and investigation protocol consisting of sampling and analysis of: (i) WPCP biosolids; (ii) WPCP domestic and non-domestic wastewater influent

13

discharges to the WPCP, including Significant Industrial User wastewater discharges to the WPCP; (iii) WPCP internal process wastewater; and (iv) final WPCP Outfall 001 discharge to the Oostanaula River. The purpose of this PFAS WPCP Investigation is to accurately characterize the nature and occurrence of PFAS relative to the Calhoun WPCP. Calhoun shall also prepare the PFAS Characterization Report defined below for submission to CRBI, based on a minimum of three sample collection events and as many as six sample collection events, with the first sample collection event occurring within 90 days of the Effective Date or such earlier date as may be agreed upon by Calhoun and CRBI (hereinafter defined as the "Calhoun PFAS WPCP Investigation").

a.  **Monitor Oversight and Administration of PFAS WPCP Investigation.** In coordination with the Parties and their respective legal counsel and expert consultants, if any, the Monitor shall oversee and administer the Calhoun PFAS WPCP Investigation, with the first sample collection event occurring within 90 days of the Effective Date.

b.  **Sampling Methods**. All sample analysis of domestic discharges, industrial wastewater, and WPCP influent and effluent shall be conducted by a laboratory certified for the analysis of PFAS and utilize wastewater draft analytical method 1633, or a method consistent with 40 CFR Part 136 once such method is finalized by EPA. All sampling and monitoring shall include each of the PFAS

14

parameters detectable by draft EPA method 1633 and shall be conducted at least quarterly to ensure that there are adequate data to assess the presence and concentration of PFAS. At least semi-annually beginning with the first collection of samples conducted under this Consent Decree, the draft Adsorbable Organic Fluorine CWA wastewater EPA method 1621 (or reasonably equivalent method once finalized by EPA) shall be used in conjunction with draft EPA method 1633. All PFAS monitoring data generated by the sampling conducted in the Consent Decree for WPCP Outfall 001 must be reported on the Calhoun WPCP Discharge Monitoring Reports as required under 40 CFR 122.41(l)(4)(i).

c.    **PFAS Characterization Report.** Upon completion of the PFAS WPCP Investigation, the Monitor shall prepare a "**PFAS Characterization Report**" that will, at a minimum, detail: (i) PFAS attributable to domestic sources, and any non-domestic sources of WPCP wastewater influent discharges to the WPCP, including Significant Industrial Users that shall be identified by name to the maximum extent practicable; (ii) PFAS in sludge/biosolids generated by the WPCP; (iii) PFAS in WPCP internal process wastewater; and (iv) PFAS in final effluent discharge at WPCP Outfall 001 as such Outfall is identified in the WPCP's NPDES Permit. The PFAS Characterization Report shall contain a narrative description supporting the basis for attribution of reported PFAS and corresponding domestic or non-domestic sources. A primary objective of the PFAS Characterization Report

shall be to reasonably characterize the relative nature, concentrations and occurrence of PFAS in various stages of WPCP wastewater influent, effluent, treatment process and sludge generation, handling and disposal, to support an evaluation of the development of Best Management Practices, local limits, or other measures consistent with EPA's 2022 NPDES PFAS guidance (defined further below) for the reduction and control of PFAS at Publicly Owned Treatment Works, and potential control, mitigation and treatment measures to eliminate or reduce PFAS at the WPCP, including the elimination or reduction of PFAS contamination of WPCP biosolids and prevention of the introduction of PFAS to the Calhoun WPCP. The Monitor shall promptly deliver the PFAS Characterization Report to Calhoun and to CRBI following development of a sufficient dataset as part of the PFAS WPCP Investigation in the Monitor's reasonable discretion within the Monitor Term.

25. **Calhoun WPCP Pretreatment Program Compliance Implementation.**

a.     Based on the results of the WPCP Investigation and the PFAS Characterization Report, and subject to prior consultation with the Monitor and CRBI, which will not be unreasonably withheld, Calhoun shall exercise its powers and responsibilities necessary to impose Best Management Practices ("BMPs") for discharges of PFAS to the Calhoun WPCP from its Significant Industrial Users as set forth by EPA in its December 5, 2022 NPDES Guidance ("EPA 2022 NPDES Guidance") (Attachment A) including Part A.3 (Best Management Practices) and

Part A.5 (Permit Limits, including site-specific Technology-based Effluent Limits).

Calhoun shall otherwise comply with 40 CFR § 403 and the terms and conditions of

its NPDES permit and further adopt the standards and guidance set forth by the EPA

2022 NPDES Guidance concerning Calhoun's operation of the WPCP, including

Part B thereto ("Recommendations for Publicly Owned Treatment Works").

b.    Calhoun shall implement wastewater treatment process modifications

and wastewater treatment modifications to achieve end of pipe effluent discharges

necessary to comply with EPA's 2022 PFAS NPDES Guidance and standards for

wastewater in accordance with the EPA 2022 NPDES Guidance applicable to

Publicly Owned Treatment Works (Part B). PFAS compliance sampling of WPCP

Outfall 001 final effluent discharge shall be published on the WPCP's discharge

monitoring reports ("DMRs").

c.    Beginning within thirty (30) days following the Effective Date,

Calhoun shall exercise its powers and responsibilities to adopt the following changes

to its pretreatment program relative to the Calhoun WPCP and implement the

following revisions to the City's Code of Ordinances:

i.    Adopt and implement as part of its approved pretreatment program

the form of Industrial User screening report and disclosure form

substantially in the form of Attachment B hereto;

17

ii.    Adopt and implement as part of its approved pretreatment program 2024 revisions to the City of Calhoun's Industrial Waste Survey to include questions and disclosure requirements in a manner substantially in the form of <u>Attachment C</u> hereto, which shall supplant and replace the currently in use Industrial Waste Survey;

iii.    Adopt and implement as part of its approved pretreatment program 2024 revisions to the City of Calhoun's form of Industrial User and Significant Industrial User Permit in a manner substantially in the form of <u>Attachment D</u> hereto, which shall supplant and replace the form of Industrial User Permit and Significant Industrial User Permit currently in use by the City of Calhoun for discharges to the City's sanitary sewer and/or Calhoun WPCP;

iv.    Adopt and implement revisions to the City of Calhoun Code of Ordinances, to incorporate the changes reflected in <u>Attachment E</u> hereto.

d.    The City shall promptly submit reports, notices (including requisite Public Notices), applications, NPDES permit renewals/modifications, or other submissions to the Georgia EPD reasonably necessary or desirable to implement the foregoing changes to Calhoun's approved Pretreatment Program and Code of Ordinances.

18

26. **Residential Well Remedial Actions.** In coordination with the Parties and their respective legal counsel and expert consultants, if any, the Monitor shall oversee and administer the following "Residential Well Remedial Actions":

a.  **Brittany Drive WTP Service Area.**  Within ninety (90) days of the Effective Date, Calhoun shall offer PFAS testing of private wells (or springs) utilized for domestic household use necessary to evaluate whether such wells comply with EPA's Maximum Contaminant Levels for PFAS to all owners of real property within the Brittany Drive Water Treatment Plant Service Area whose real property is situated within two miles of the nearest property boundary of a current or formerly approved Calhoun WPCP biosolid land application site (identified in Attachment F – list of sludge field IDs (and map for illustrative purposes)) who are not currently connected to municipal drinking water. Analytical methods for such testing shall consist of EPA method 537.1 (drinking water), and the results of such testing shall be provided to CRBI, the Monitor, and the owner of such real property. Calhoun shall have the option, but not the obligation, to accept the results of owner-supplied PFAS sampling if Calhoun accepts the results as sufficient to qualify that residential home for alternative water supply as described herein. Thereafter, based on the results of the well or spring sampling, Calhoun shall offer a connection to municipal drinking water if municipal drinking water service is available (meaning, if existing municipal water line infrastructure exists in reasonable proximity to the

home at issue in the determination of the City of Calhoun) free of charge if the results meet or exceed EPA's Maximum Contaminant Levels for PFAS with a 75% margin of safety to provide for  variations in groundwater.[2] Such offers shall remain open for at least a 2-year time period and shall be published on Calhoun's website and provided to each record owner of real property subject to this paragraph by the City of Calhoun in writing via certified mail, return receipt requested (together with a hard copy of EPA's Final PFAS National Primary Drinking Water Regulation literature and associated final Maximum Contaminant Level fact sheet), and such offer shall be published in a newspaper of general circulation within the City of Calhoun for at least two consecutive weeks. Notwithstanding the foregoing, Calhoun shall not be obligated to extend any offer, or provide any services described in this paragraph to:

  i.   Any residential home that is not situated in Gordon County, Georgia; or

  ii.  Any residential home, building, structure, or subdivision that is not existing and/or permitted for occupancy as of the Effective Date of this Consent Decree.

---

[2] For example, a well testing at 3 ppt for PFOA or PFOS, 7 ppt for PFNA or PFHxS, or a Hazard Index value of .75 for detections of two or more of PFNA, PFHxS and/or PFBS, would be eligible for the free connection to the municipal water supply or the point of entry GAC system.

b.     **Mauldin Road WTP Service Area.** Within ninety (90) days of the

Effective Date, Calhoun shall offer PFAS testing of private wells (or springs)

utilized for domestic household use necessary to evaluate whether such wells

comply with EPA's Maximum Contaminant Levels for PFAS to all owners of real

property within the Mauldin Road Water Treatment Plant Service Area whose real

property is situated within two miles of the nearest property boundary of a current

or formerly approved Calhoun WPCP biosolids land application site (identified in

Attachment F – list of sludge field IDs (and map for illustrative purposes)) who is

not currently connected to municipal drinking water. Analytical methods for such

testing shall consist of EPA method 537.1 (drinking water), and the results of such

testing shall be provided to CRBI, the Monitor, and the owner of such real property.

Calhoun shall have the option, but not the obligation, to accept the results of owner-

supplied PFAS sampling if Calhoun accepts the results as sufficient to qualify that

residential home for alternative water supply as described herein. Thereafter, based

on the results of the well sampling, Calhoun shall offer a connection to municipal

drinking water if municipal drinking water service is available (meaning, if existing

municipal water line infrastructure exists in reasonable proximity to the home at

issue in the determination of the City of Calhoun) free of charge if the results meet

or exceed EPA's Maximum Contaminant Levels for PFAS with a 75% margin of

safety to provide for variations in groundwater.[3] Such offer shall remain open for at least a 2-year time period and shall be published on Calhoun's website and provided to each record owner of real property by the City of Calhoun in writing via certified mail, return receipt requested (together with a hard copy of EPA's Final PFAS National Primary Drinking Water Regulation literature and associated final Maximum Contaminant Level fact sheet), and such offer shall be published in a newspaper of general circulation within the City of Calhoun for at least two consecutive weeks. Notwithstanding the foregoing, Calhoun shall not be obligated to extend any offer, or provide any services described in this paragraph to:

      i.    Any residential home that is not situated in Gordon County, Georgia; or

      ii.    Any residential home, building, structure, or subdivision that is not existing and/or permitted for occupancy as of the date of entry of the Consent Decree.

    c.    **Point of Entry GAC Home Filtration Systems.** If municipal water service is unavailable to service properties identified in Paragraphs 26a and 26b, Calhoun, or its assignee, will work with the property owner who otherwise qualifies for remedial action to address PFAS in their drinking water to offer to install and maintain an approved point of entry GAC home filtration system to remove PFAS

---

[3] *See* Footnote 2, above.

in order to meet EPA's Maximum Contaminant Levels for PFAS. Calhoun, or its assignee, shall be responsible for the costs of installation and annual maintenance of these systems and all other necessary and reasonable associated costs for a period of at least ten (10) years to ensure proper operation and removal of PFAS. Such offer shall remain open for at least a 2-year time period and shall be provided to each record owner of real property subject to this paragraph by the City of Calhoun in writing via certified mail, return receipt requested. The offer shall also be published on the City's website and in a newspaper of general circulation within the City of Calhoun for at least two consecutive weeks. Calhoun reserves all rights to seek recovery of any installation and maintenance costs for these systems from third parties, including, but not limited to the defendants named in the in the lawsuit styled *Moss Land Company, LLC, et al. v. City of Calhoun, Georgia, et al.,* Superior Court of Gordon County, State of Georgia, Civil Action File No. 24CV73929, and/or other litigation that may arise. Notwithstanding the foregoing, in the event that municipal water lines later become available to a residential home for which a point of entry GAC home filtration system has been provided pursuant to this paragraph, Calhoun or its assignee shall be relieved of the responsibility to maintain or monitor the filtration system upon the expiration of 90 days advance written notice to the homeowner, so long as a service connection to municipal water is offered to the

homeowner free of charge, which offer shall be tendered via certified mail return receipt requested and remain open for a period of at least ninety (90) days.

d.    The efforts of Calhoun to comply with its obligations to perform the Residential Well Remedial Actions as outlined in this Section is contingent upon the cooperation and express permission of the applicable property owners, water users, and/or well water users. Should such owner or user refuse the notice, offers or participatory offers by Calhoun, or its assignee or designee, Calhoun will, with the approval of the Monitor, have met its obligations and be relieved from any further obligations and responsibilities as outlined herein as to that residential home/homeowner.

e.    CRBI shall have the option to select up to two residential homes within the Brittany Drive Service Area that will be eligible for either (at Calhoun's sole option) a service connection to the Brittany Drive Water Treatment Plant or a point of entry GAC home filtration system as described above, and subject to the conditions set forth above with respect to the 10 year duration of operation and maintenance, and other conditions described in this Section. CRBI may exercise this option by written notice to the Monitor, copy to a representative of Calhoun within one year following any private residential well or spring sampling described in this Section.

27.    **Completion of the Residential Well Remedial Actions.** Calhoun shall make all reasonable efforts to complete the Residential Well Remedial Actions within three (3) years of the Effective Date, or such earlier time as practicable, unless CRBI agrees to extend the date of compliance in writing, which agreement shall not be unreasonably withheld by CRBI.

28.    **Monitor's Calhoun WPCP PFAS Compliance Report.** Prior to the end of the Monitor Term, the Monitor shall deliver to Calhoun and CRBI a written determination of Calhoun's compliance with the obligations, commitments, and requirements set forth in this Consent Decree. In the event the Monitor determines that Calhoun's compliance with the obligations, commitments, and requirements are not reasonably achievable within the Monitor Term, the Monitor shall develop a compliance timeline and final compliance date. The Calhoun WPCP PFAS Compliance Report shall include the materials and data on which the Monitor's certifications of compliance are based and will identify any deficiencies or non-compliance that must be rectified by the City and a compliance timeline for achieving the same. The Monitor's Calhoun WPCP PFAS Compliance Report shall be retained as a part of the WPCP's operating record and submitted to EPD to be part of Calhoun's NPDES permit file, with a copy to CRBI.

## V.    ATTORNEY FEES / EXPERT FEES AND COSTS

29.    The Parties have reached an Independent Settlement Agreement regarding attorney fees, expert costs, and litigation costs and expenses in connection with this matter.

## VI.    RELEASE

30.    For the consideration herein and other good and valuable consideration, CRBI hereby waives, releases, discharges, and covenants not to sue the City of Calhoun for any claims arising out of, or may in any way grow out of the facts giving rise to the Litigation, including, without limitation, any and all known or unknown claims which have resulted and may result from the alleged act or omissions of the City of Calhoun including alleged violations of the Clean Water Act and/or the Resource Conservation and Recovery Act.

## VII.    OTHER TERMS

31.    **Effect of Consent Decree.**  This Consent Decree resolves all claims which were alleged or could have been alleged against Calhoun by CRBI in the Litigation, and all such claims shall be deemed to be dismissed with prejudice. This Consent Decree in no way affects or relieves Calhoun from its responsibility and obligation to comply with Federal, State and local laws or regulations and applicable permits.

32.    **No Admission of Liability or Fault.** By entering into this Consent Decree, Calhoun denies and does not admit liability, fault, or wrongdoing.

33.    **Administrative Review.** The Parties acknowledge and agree that, pursuant to 33 U.S.C. § 1365(c)(3), this Consent Decree cannot be entered or effective prior to forty-five (45) days following the receipt of this Consent Decree by the Attorney General and the EPA Administrator. Therefore, upon execution of this Consent Decree by the Parties, Plaintiff shall serve copies of the Consent Decree upon the U.S. Attorney General, EPA Administrator, and EPA Regional Administrator in accordance with 40 C.F.R. § 135.5. The Parties shall also jointly lodge the Consent Decree with the Court upon execution.  Upon expiration of the 45-day review period, so long as the reviewing authorities do not object to the entry of this Consent Decree, the Parties shall jointly move the Court for entry of the Consent Decree.

34.    **Continuing Jurisdiction.** The United States District Court for the Northern District of Georgia shall have continuing jurisdiction to interpret and enforce the terms and conditions of this Consent Decree and to resolve disputes arising hereunder, and for such other and further actions as may be necessary or appropriate in the construction or execution of the Consent Decree.

35.    **Effect of Entry or Lack of Entry.** Upon entry by the Court, this Consent Decree resolves all claims which were alleged or could have been alleged

against Calhoun by CRBI in the Litigation and the Litigation shall be dismissed with prejudice. If for any reason the reviewing authorities object to this Consent Decree and the Court refuses to approve and/or enter this Consent Decree in the form presented, the Parties shall retain all rights they had in this litigation before lodging of this Consent Decree.

36.  **Entire Agreement.** This Consent Decree constitutes the entire agreement among the Parties concerning the subject matter hereof and supersedes all previous correspondence, communications, agreements and understandings, whether oral or written, among the Parties or their representatives.

37.  **Modification**. This Consent Decree may be modified only by an Order issued from the Court, made upon the written consent of the Parties.

38.  **Authorization**. Each Party represents and warrants that the person signing this Consent Decree on behalf of such Party has been duly authorized to enter into this Consent Decree on the Party's behalf.

39.  **Successors and Assigns**. This Consent Decree shall be binding upon and inure to the benefit of the Parties and their respective successors and assigns.

40.  **Notices/Dispute Resolution**. The Parties shall provide one another with thirty (30) days written notice and opportunity to cure any alleged breach of this Consent Decree before commencing an action to enforce this Consent Decree. Such notice shall be given to all counsel of record, as reflected on the Court's docket

report, and may be given via email, facsimile, first class mail or nationally recognized courier service.  If the affected Parties cannot reach an agreed resolution within thirty (30) days after the receipt of notice by the other Party, then the Parties agree to commence mediation of the dispute in good faith no later than seventy-five (75) days after the receipt of the notice.  A Party may petition the District Court to (a) resolve the dispute; (b) designate a mediator for good cause shown if the Parties cannot agree on a mediator mutually agreeable to the Parties; or (c) seek to enforce the Final Consent Decree only where a mediation was conducted in good faith and is unsuccessful.

41.    **Counterparts**. This Consent Decree may be signed in counterparts. Facsimile, electronic and scanned signatures or copies of this Consent Decree shall be effective as originals for all purposes.

ENTERED this 24th day of October, 2024.

William M. Ray II
WILLIAM M. RAY, II
UNITED STATES DISTRICT JUDGE

**APPROVED FOR ENTRY:**

/s/ Christopher J. Bowers
Christopher J. Bowers
GA Bar No. 071507
R. Hutton Brown
GA Bar No. 089280
SOUTHERN ENVIRONMENTAL LAW CENTER
10 10th Street NW, Suite 1050
Atlanta, GA 30308
Telephone: 404-521-9900
cbowers@selcga.org
hbrown@selcga.org

James S. Whitlock
NC Bar No. 34304 (*pro hac vice*)
SOUTHERN ENVIRONMENTAL LAW CENTER
48 Patton Avenue, Suite 304
Asheville, NC 28801
Telephone: (828) 258-2023
jwhitlock@selcnc.org


*Attorneys for Plaintiff Coosa River Basin Initiative*


/s/ J. Anderson Davis
J. Anderson Davis
GA Bar No. 211077
DAVIS LUCAS CARTER LLP
210 East 2nd Avenue, Suite 301
Rome, GA 30161
Telephone: (706) 842-7555
adavis@davislucascarter.com

*/s/ George P. Govignon*
George P. Govignon
GA Bar No. 303290
Govignon Law
109 N Wall Street
Calhoun, GA 30701
Telephone: (706) 629-7070

**Attorney for Defendant City of Calhoun, Georgia**

Attachment 1



| FIELD ID | USABLE ACREAGE (ACRES) | SITE COORDINATES |
|---|---|---|
| 11-01 | 22 | 34.55°, -084.865° |
| 11-02 | 203 | 34.554°, -084.87° |
| 11-03 | 212 | 34.554°, -084.859° |
| 11-04 | 108 | 34.545°, -084.86° |
| 11-05 | 221 | 34.539°, -084.852° |
| 11-06 | 104 | 34.539°, -084.863° |
| 11-07 | 9 | 34.546°, -084.852° |
| 11-08 | 20 | 34.534°, -084.88° |
| 11-09 | 60 | 34.53°, -084.877° |
| 11-10 | 72 | 34.534°, -084.875° |
| 11-11 | 50 | 34.54°, -084.868° |
| 11-12 | 32.2 | 34.565°, -084.864° |

| CITY OF CALHOUN CALHOUN, GEORGIA 30701 | CITY OF CALHOUN LAND APPLICATION SITE 11 PINE CHAPEL ROAD & MOSS ROAD CALHOUN, GEORGIA 30701    PHONE: (706) 629-4701 | SCALE: 1" = 2000' 10' CONTOURS | DATE | REVISIONS | DESIGNED BY: DRAWN BY: H. BARNETTE DATE:6/6/22 | SHEET 1 of 1 |

Attachment A



**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**
WASHINGTON, D.C. 20460

OFFICE OF WATER

December 5, 2022

**MEMORANDUM**

**SUBJECT:**   Addressing PFAS Discharges in NPDES Permits and Through the Pretreatment Program and Monitoring Programs

**FROM:**   Radhika Fox
Assistant Administrator

**TO:**   EPA Regional Water Division Directors, Regions 1-10

The National Pollutant Discharge Elimination System (NPDES) program is an important tool established by the Clean Water Act (CWA) to help address water pollution by regulating point sources that discharge pollutants to waters of the United States. Collectively, the U.S. Environmental Protection Agency (EPA) and states issue thousands of permits annually, establishing important monitoring and pollution reduction requirements for Publicly Owned Treatment Works (POTWs), industrial facilities, and stormwater discharges nationwide. The NPDES program interfaces with many pathways by which per-and polyfluoroalkyl substances (PFAS) travel and are released into the environment, and ultimately impact water quality and the health of people and ecosystems. Consistent with the Agency's commitments in the October 2021 *PFAS Strategic Roadmap: EPA's Commitments to Action 2021-2024 (PFAS Strategic Roadmap)*, EPA will work in cooperation with our state-authorized permitting authorities to leverage the NPDES program to restrict the discharge of PFAS at their sources. In addition to reducing PFAS discharges, this program will enable EPA and the states to obtain comprehensive information on the sources and quantities of PFAS discharges, which can be used to inform appropriate next steps to limit the discharges of PFAS.

This memorandum provides EPA's guidance to states and updates the April 28, 2022 guidance[1] to EPA Regions for addressing PFAS discharges when they are authorized to administer the NPDES permitting program and/or pretreatment program. These recommendations reflect the Agency's commitments in the PFAS Strategic Roadmap, which directs the Office of Water to leverage NPDES permits to reduce PFAS discharges to waterways *"at the source and obtain more comprehensive information through monitoring on the sources of PFAS and quantity of PFAS discharged by these sources."* While the Office of Water works to revise Effluent Limitation Guidelines (ELGs) and develop water quality criteria to support technology-based and water quality-based effluent limits for PFAS in NPDES permits, this memorandum describes steps permit writers can implement under existing authorities to reduce the discharge of PFAS.

---

[1] Addressing PFAS Discharges in EPA-Issued NPDES Permits and Expectations Where EPA is the Pretreatment Control Authority, https://www.epa.gov/system/files/documents/2022-04/npdes_pfas-memo.pdf.

This memorandum also provides EPA's guidance for addressing sewage sludge PFAS contamination more rapidly than possible with monitoring based solely on NPDES permit renewals. States may choose to monitor the levels of PFAS in sewage sludge across POTWs and then consider mechanisms under pretreatment program authorities to prevent the introduction of PFAS to POTWs based on the monitoring results.

EPA recommends that the following array of NPDES and pretreatment provisions and monitoring programs be implemented by authorized states and POTWs, as appropriate, to the fullest extent available under state and local law. NPDES and pretreatment provisions may be included when issuing a permit or by modifying an existing permit pursuant to 40 CFR 122.62.

## A.  Recommendations for Applicable Industrial Direct Dischargers

1. **Applicability:** Industry categories known or suspected to discharge PFAS as identified on page 14 of the PFAS Strategic Roadmap include: organic chemicals, plastics & synthetic fibers (OCPSF); metal finishing; electroplating; electric and electronic components; landfills; pulp, paper & paperboard; leather tanning & finishing; plastics molding & forming; textile mills; paint formulating, and airports. This is not an exhaustive list and additional industries may also discharge PFAS. For example, Centralized Waste Treatment (CWT) facilities may receive wastes from the aforementioned industries and should be considered for monitoring. There may also be categories of dischargers that do not meet the applicability criteria of any existing ELG; for instance, remediation sites, chemical manufacturing not covered by OCPSF, and military bases.

   EPA notes that no permit may be issued to the owner or operator of a facility unless the owner or operator submits a complete permit application in accordance with applicable regulations, and applicants must provide any additional information that the permitting authority may reasonably require to assess the discharges of the facility (40 CFR 122.21(e), (g)(13)).[2] The applicant may be required to submit additional information under CWA Section 308 or under a similar provision of state law.

2. **Effluent-and wastewater residuals monitoring:** In the absence of a final 40 CFR Part 136 method, EPA recommends using CWA wastewater draft analytical method 1633 (*see* 40 CFR 122.21(e)(3)(ii) and 40 CFR 122.44(i)(1)(iv)(B)). EPA also recommends that monitoring include each of the 40 PFAS parameters detectable by draft method 1633 and be conducted at least quarterly to ensure that there are adequate data to assess the presence and concentration of PFAS in discharges. All PFAS monitoring data must be reported on Discharge Monitoring Reports (DMRs) (*see* 40 CFR 122.41(l)(4)(i)). The draft Adsorbable Organic Fluorine CWA wastewater method 1621 can be used in conjunction with draft method 1633, if appropriate. Certain industrial processes may generate PFAS-contaminated solid waste or air emissions not covered by NPDES permitting and permitting agencies should coordinate with appropriate state authorities on proper containment and disposal to avoid cross-media contamination. EPA's draft analytical method 1633 may be appropriate to assess the amount and types of PFAS for some of these wastestreams.[3]

---

[2] For more, see NPDES Permit Writer's Manual Section 4.5.1.
[3] See https://www.epa.gov/water-research/pfas-analytical-methods-development-and-sampling-research for a list of EPA-approved methods for other media.

3. **Best Management Practices (BMPs) for discharges of PFAS, including product substitution, reduction, or elimination of PFAS, as detected by draft method 1633:** Pursuant to 40 CFR 122.44(k)(4), EPA recommends that NPDES permits for facilities incorporate the following conditions when the practices are "reasonably necessary to achieve effluent limitations and standards or to carry out the purposes and intent of the CWA."[4]
   a. BMP conditions based on pollution prevention/source reduction opportunities, which may include:
      i. Product elimination or substitution when a reasonable alternative to using PFAS is available in the industrial process.
      ii. Accidental discharge minimization by optimizing operations and good housekeeping practices.
      iii. Equipment decontamination or replacement (such as in metal finishing facilities) where PFAS products have historically been used to prevent discharge of legacy PFAS following the implementation of product substitution.
   b. Example BMP permit special condition language:
      i. *PFAS pollution prevention/source reduction evaluation*: Within 6 months of the effective date of the permit, the facility shall provide an evaluation of whether the facility uses or has historically used any products containing PFAS, whether use of those products or legacy contamination reasonably can be reduced or eliminated, and a plan to implement those steps.
      ii. *Reduction or Elimination*: Within 12 months of the effective date of the permit, the facility shall implement the plan in accordance with the PFAS pollution prevention/source reduction evaluation.
      iii. *Annual Report*: An annual status report shall be developed which includes a list of potential PFAS sources, summary of actions taken to reduce or eliminate PFAS, any applicable source monitoring results, any applicable effluent results for the previous year, and any relevant adjustments to the plan, based on the findings.
      iv. *Reporting*: When EPA's electronic reporting tool for DMRs (called "NetDMR") allows for the permittee to submit the pollution prevention/source reduction evaluation and the annual report, the example permit language can read, "The pollution prevention/source reduction evaluation and annual report shall be submitted to EPA via EPA's electronic reporting tool for DMRs (called "NetDMR").

4. **BMPs to address PFAS-containing firefighting foams for stormwater permits:** Pursuant to 122.44(k)(2), where appropriate, EPA recommends that NPDES stormwater permits include BMPs to address Aqueous Film Forming Foam (AFFF) used for firefighting, such as the following:[5]
   a. Prohibiting the use of AFFFs other than for actual firefighting.
   b. Eliminating PFOS and PFOA -containing AFFFs.
   c. Requiring immediate clean-up in all situations where AFFFs have been used, including diversions and other measures that prevent discharges via storm sewer systems.

5. **Permit Limits:** As specified in 40 CFR 125.3, technology-based treatment requirements under CWA Section 301(b) represent the minimum level of control that must be imposed in NPDES permits. Site-specific technology-based effluent limits (TBELs) for PFAS discharges developed on a best professional judgment (BPJ) basis may be appropriate for facilities for which there are no applicable effluent guidelines (*see* 40 CFR 122.44(a), 125.3). Also, NPDES permits must include water quality-based effluent limits (WQBELs) as derived from state water quality standards, in

---

[4] For more on BMPs, see NPDES Permit Writer's Manual Section 9.1 and EPA Guidance Manual for Developing Best Management Practices.
[5] Naval Air Station Whidbey Island MS4 permit incorporates these provisions.

addition to TBELs developed on a BPJ basis, if necessary to achieve water quality standards, including state narrative criteria for water quality (CWA Section 301(b)(1)(C); 40 CFR 122.44(d)). If a state has established a numeric criterion or a numeric translation of an existing narrative water quality standard for PFAS parameters, the permit writer should apply that numeric criterion or narrative interpretation in permitting decisions, pursuant to 40 CFR 122.44(d)(1)(iii) and 122.44(d)(1)(vi)(A), respectively.

**B. Recommendations for Publicly Owned Treatment Works**

1. **Applicability:** All POTWs, including POTWs that do not receive industrial discharges, and industrial users (IUs) in the industrial categories above.

2. **Effluent, influent, and biosolids monitoring:** In the absence of a final 40 CFR Part 136 method, EPA recommends using CWA wastewater draft analytical method 1633 (*see* 40 CFR 122.21(e)(3)(ii) and 40 CFR 122.44(i)(1)(iv)(B)). EPA also recommends that monitoring include each of the 40 PFAS parameters detectable by draft method 1633 and be conducted at least quarterly to ensure that there are adequate data to assess the presence and concentration of PFAS in discharges. All PFAS monitoring data must be reported on DMRs (*see* 40 CFR 122.41(l)(4)(i)). The draft Adsorbable Organic Fluorine CWA wastewater method 1621 can be used in conjunction with draft method 1633, if appropriate.

3. **Pretreatment program activities:**
   a. Update IU Inventory: Permits to POTWs should contain requirements to identify and locate all possible IUs that might be subject to the pretreatment program and identify the character and volume of pollutants contributed to the POTW by the IUs (*see* 40 CFR 403.8(f)(2)). As EPA regulations require, this information shall be provided to the pretreatment control authority (*see* 40 CFR 122.44(j) and 40 CFR 403.8(f)(6)) within one year. The IU inventory should be revised, as necessary, to include all IUs in industry categories expected or suspected of PFAS discharges listed above (*see* 40 CFR 403.12(i)).[6]
   b. Utilize BMPs and pollution prevention to address PFAS discharges to POTWs. EPA recommends that POTWs:
      i. Update IU permits/control mechanisms to require quarterly monitoring. These IUs should be input into the Integrated Compliance Information System (ICIS) with appropriate linkage to their respective receiving POTWs. POTWs and states may also use their available authorities to conduct quarterly monitoring of the IUs (*see* 40 CFR 403.8(f)(2), 403.10(e) and (f)(2)).
      ii. Where authority exists, develop IU BMPs or local limits. 40 CFR 403.5(c)(4) authorizes POTWs to develop local limits in the form of BMPs. Such BMPs could be like those for industrial direct discharges described in A.3 above.
      iii. In the absence of local limits and POTW legal authority to issue IU control mechanisms, state pretreatment coordinators are encouraged to work with the POTWs to encourage pollution prevention, product substitution, and good housekeeping practices to make meaningful reductions in PFAS introduced to POTWs.

---

[6] ELG categories of **airport deicing, landfills, textile mills, and plastics molding and forming do not have categorical pretreatment standards**, and therefore small-volume indirect dischargers in those categories would not ordinarily be considered Significant Industrial Users (SIUs) and may not be captured on an existing IU inventory. IUs under the Paint Formulating category are only subject to Pretreatment Standards for New Sources (PSNS), and existing sources may need to be inventoried.

C. <u>Recommended Biosolids Assessment</u>

1. **Where appropriate, states may work with their POTWs to reduce the amount of PFAS chemicals in biosolids, in addition to the NPDES recommendations in Section B above, following these general steps:**[7]
   a. EPA recommends using draft method 1633 to analyze biosolids at POTWs for the presence of 40 PFAS chemicals.[8]
   b. Where monitoring and IU inventory per section B.2 and B.3.a above indicate the presence of PFAS in biosolids from industrial sources, EPA recommends actions in B.3.b to reduce PFAS discharges from IUs.
   c. EPA recommends validating PFAS reductions with regular monitoring of biosolids. States may also use their available authorities to conduct quarterly monitoring of the POTWs (*see* 40 CFR 403.10(f)(2)).

D. <u>Recommended Public Notice for Draft Permits with PFAS-Specific Conditions</u>

1. **In addition to the requirements for public notice described in 40 CFR 124.10, EPA recommends that NPDES permitting authorities provide notification to potentially affected downstream public water systems (PWS) of draft permits with PFAS-specific monitoring, BMPs, or other conditions:**
   a. Public notice of the draft permit would be provided to potentially affected PWS with intakes located downstream of the NPDES discharge.
   b. NPDES permit writers are encouraged to collaborate with their drinking water program counterparts to determine on a site-specific basis which PWS to notify.
      i. EPA's Drinking Water Mapping Application to Protect Source Waters (DWMAPS) tool may be helpful as a screening tool to identify potentially affected PWS to notify.
   c. EPA will provide instructions on how to search for facility-specific discharge monitoring data in EPA's publicly available search tools.

---

[7] EPA is currently evaluating the potential risk of PFOA and PFOS in biosolids and supporting studies and activities to evaluate the presence of PFOA and PFOS in biosolids. This recommendation is not meant to supersede the PFOA and PFOS risk assessment or supporting activities. The conclusions of the risk assessment and supporting studies may indicate that regulatory actions or more stringent requirements are necessary to protect human health and the environment.

[8] While water quality monitoring activities (including monitoring of PFAS associated with NPDES permit or pretreatment requirements) at POTWs are generally not eligible for Clean Water State Revolving Fund (CWSRF), monitoring for the specific purpose of project development (planning, design, and construction) is eligible. Monitoring in this capacity, and within a reasonable timeframe, can be integral to the identification of the best solutions (through an alternatives analysis) for addressing emerging contaminants and characterizing discharge and point of disposal (e.g., land application of biosolids). Though ideally the planning and monitoring for project development would result in a CWSRF-eligible capital project, in some instances, the planning could lead to outcomes other than capital projects to address the emerging contaminants.

Attachment B

**[City of Calhoun Letterhead from Utilities Administrator / Wastewater Director]**

**[Date]**

**[Addressee]**
**[Address]**

RE:      **Request for Information related to PFAS**

As an existing, new or expanding Industrial User or other non-domestic user of the City of Calhoun's wastewater collection and treatment system, please provide the following information on your organization's possible use, production, and discharge of PFAS, or any other contaminants that you are aware of that may be discharged from your facility into the Calhoun sanitary sewer system. Per- and poly-fluoroalkyl substances (PFAS) are a large class of organic chemical substances that have been manufactured and used around the world and in the U.S. since at least the 1940s. These chemicals are persistent in the environment, and they are suspected of presenting human health and other risks. "PFOA," "PFOS," and "PFBS" are some of the more highly studied and highly publicized of the PFAS chemicals; however, for the purpose of this request for information, the term PFAS includes any fluorinated substance that contains at least one fully fluorinated methyl or methylene carbon atom, including any precursors of such substances. PFAS chemicals are found in many consumer products like rugs, carpets, food packaging, surfactants, and stain repellants. PFAS manufacturing and processing facilities, carpet and rug producers, airports, and military installations that use firefighting foams are some of the main sources of PFAS, although they are also known to occur in other common industrial and consumer product manufacturing. PFAS may be released from these facilities into the air, soil, and water, including sources of drinking water. For more general information on PFAS see EPA at the following website. https://www.epa.gov/pfas.

PFAS have generated significant public concern, litigation, and regulation. Accordingly, the City of Calhoun wishes to identify and evaluate the possible presence of PFAS chemicals, and any other contaminants of concern that you may be aware of in your process that will be discharged into our system. If your data indicates the presence of such chemicals at levels of concern, including levels that would cause pass-through or interference at the City of Calhoun's Water Pollution Control Plant (WPCP), we will work with you to identify options for minimizing the discharge of such chemicals into our sanitary sewer system.

Accordingly, pursuant to our sewer use ordinance, we are requiring your organization to provide the information requested below.

We ask that your organization respond in writing by **[Date]**. Your response must be signed by the highest ranking official or a responsible corporate officer of your organization consistent with 40 C.F.R. section 403.12(l). The response must also be certified as required by 40 C.F.R. section 403.12(l). For your convenience, a copy of the required Certification Statement language is included at the end of this letter.

pg. 1

**Please provide the following information by [DATE]:**

1. Identify the person[s] responding and assisting in the response to this Information Request.

2. Do you produce any products, byproducts, wastes or other materials that you know to contain or that you would reasonably suspect to contain any PFAS chemical?

3. Do you purchase, otherwise obtain or use any raw materials, commercial products or other substances or materials that contain or that you would reasonably suspect to contain any PFAS chemicals?

4. Do you have or have access to, or are you aware of, any information or data on the occurrence, concentration or amount of any PFAS chemicals or constituents in the wastewater that your organization will discharge to the City of Calhoun's sanitary sewer system and/or the Calhoun Water Pollution Control Plant?

5. If the answer to any of the questions above is "Yes," identify any such products, byproducts, wastes, raw materials, commercial products, or other materials, and any such occurrence, concentration or amounts and provide any data or supporting information.

6. Provide any other information, sampling and analysis and other data, and copies of documents that you believe would be helpful in understanding any use or production of any PFAS chemicals by your organization.

7. Identify the nature, source and location of any data of which you are aware, but which is not in your possession or under your control, relating to the occurrence, concentration or amount of any PFAS chemicals or constituents identified as being present at your facility.

8. Please identify any other contaminants that you know, or suspect will be in your discharge to our sewer system, and which may be harmful to the environment or public health.

9. Within 60 days of commencement of your facility's discharge to our sewer system (or for existing wastewater discharges, within 60 days from the date of this letter), sample your discharge to the City of Calhoun's sanitary sewer system for targeted (using at a minimum EPA method 1633 for wastewater, as currently drafted or finalized) PFAS sample results. Provide the sampling results to us within 90 days of the commencement of your facility's discharge to our sewer system (or for existing wastewater discharges, within 90 days of the date of this letter).

10. If you will discharge an average daily flow of 7,500 gallons or more, also, within 60 days of commencement of your facility's discharge to the City of Calhoun's sanitary sewer system (or within 60 days of the date of this letter for existing dischargers), sample your discharge to the City of Calhoun's sanitary sewer system using total oxidizable precursor assay, EPA Adsorbable Organic Fluorine method 1621 (as currently drafted or finalized), or other non-targeted method. Provide the sampling results to us within 90 days of the commencement of your facility's discharge to our sewer system (or for existing wastewater discharges, within 90 days of the date of this letter).

**Please follow these instructions in preparing and submitting your responses.**

1. Your responses must be prepared or assisted by a qualified employee or agent of your organization who understands the organization's business processes and activities.

2. If laboratory data are provided, include laboratory sheets and chain of custody forms.

3. Provide a narrative or other response to each of the City of Calhoun's requests in a manner that identifies the specific request to which it responds.

4. If information responsive to this Information Request is not in your organization's possession, then identify any person of whom you are aware and from whom such information may be obtained.

5. If you believe there may be persons able to provide a more detailed or complete response to the Information Request, or who may be able to provide additional responsive documents or data, identify the person(s) and the additional information or data that they may have.

6. If any request relates to activities undertaken by entities other than the recipient of this

   Information Request, identify those other entities, and provide the requested information that you have for such entities.

7. If information or data are not known or available as of the date of your response, and such information or data later become available, or if you later determine that any information or data submitted was incorrect or misrepresented the truth, you must promptly supplement your response.

8. Your organization's confidential business information may be asserted and protected in the manner provided by U.S. Environmental Protection Agency regulations at 40 C.F.R. section 2.203(b). Note that effluent sampling and analytical data may not be treated as confidential.

9. Provide the following certification with your response:

**The certification statement:**

I certify under penalty of law that this document and all attachments were prepared under my direction or supervision in accordance with a system designed to assure that qualified personnel properly gather and evaluate the information submitted. Based on my inquiry of the person or persons who manage the system, or those persons directly responsible for gathering the information, the information submitted is, to the best of my knowledge and belief, true, accurate, and complete. I am aware that there are significant penalties for submitting false information, including the possibility of fine and imprisonment for knowing violations.

The City of Calhoun appreciates your efforts in responding to this Request for Information, and in assisting the City in our planning on matters that impact public health and the environment. If you have questions concerning the Request for Information, please direct them to me or ___, Pretreatment [official] at ____ or in writing to the address above.

Sincerely,


[Name]_____
Water and Sewer Director
Calhoun Utilities
City of Calhoun, Georgia

pg. 4

<u>Attachment C</u>

*[the following language should be reflected in an amended Calhoun Utilities Industrial Waste Survey (version 2024)* Industrial-Waste-Survey-2009.pdf (cityofcalhoun-ga.com) *and re-issued to all current Industrial Users, and issued to all future Industrial Users as a condition to issuance or renewals of an Industrial User Permit authorizing discharge to the sanitary sewer]*

Amend **Section G. FEDERAL PRETREATMENT STANDARDS**, p. 9 to include a new subsection g5) with the following question:

**g5)      If this plant answered "Yes" to question (k1) in Section K (PFAS) below, <u>please attach a narrative explanation</u> for how you have or propose to implement Best Management Practices (BMP) to reduce or eliminate the discharge of PFAS to the sanitary sewer to comply with the Federal Pretreatment Standards, <u>40 CFR § 403</u> *et seq.,* with reference to EPA's December 5, 2022 PFAS NPDES Guidance applicable to Industrial Users / indirect dischargers, Part B.3.b.ii, and Part A.3, or similar EPA guidance or regulations that may be developed in the future.[1] Information provided must be sufficiently specific to enable the Calhoun Utilities to develop and impose BMP Conditions and BMP permit special conditions, where appropriate, for Calhoun Utilities to comply with <u>40 CFR § 403</u> and the terms of its NPDES Permit that prohibit Pass Through, Interference, and municipal sludge contamination.**

---

[1] https://www.epa.gov/system/files/documents/2022-12/NPDES_PFAS_State%20Memo_December_2022.pdf

*[New Section to be included in City of Calhoun Industrial Pretreatment Permit Application / Renewal Application forms, to be completed by each Industrial User discharging wastewater effluent to the Calhoun Water Pollution Control Plant (WPCP). Based generally on South Carolina DHEC NPDES forms]*

**K**    <u>**PFAS**</u>

"PFAS" is defined as per- and polyfluoroalkyl substances, further defined as fluorinated substances that contain at least one fully fluorinated methyl or methylene carbon atom including known precursors thereto.

Applicant shall complete the following and return the same with the referenced supporting materials:

**(k1)**    **Does your facility use, handle, manufacture, formulate, or repackage PFAS in its operations that may be discharged to the sanitary sewer?**

(  ) Yes  (  ) No

**(k2)**    **If "Yes" indicated above:**

**A.  Please indicate the specific PFAS compound(s) present (or suspected to be present) in your effluent discharge to the Calhoun sanitary sewer (including the Calhoun Water Pollution Control Plant), the reason the pollutant is believed present, and the results of at least one laboratory sample analysis by a certified laboratory under EPA Method 1633 (wastewater), reporting all parameters covered by such analytical method.**

**B.  PFAS Laboratory Analytical Data.** Please enclose a Certified Laboratory Analytical Report reporting PFAS in your effluent discharge to the Calhoun WPCP indicated in your response to Subsection 2.A. immediately above, and indicate below whether an Laboratory Analytical Report is enclosed with this application/renewal application.

**(  ) Analytical Report Enclosed  (  ) Analytical Report Not Enclosed**

Attachment D

*[Form of Pretreatment Permit / Industrial User Permit issued by City of Calhoun to industrial users and Significant Industrial Users]*

*[New Section / Subsection to be included in each Permit and renewal Permit]*

[A].    Introduction of pollutants, including Per- and polyfluoroalkyl substances (PFAS), to the sanitary sewer that interfere with the use and disposal of municipal sludge is prohibited. 40 CFR 403.2(a).

[B]    Introduction of pollutants, including PFAS, to the sanitary sewer which, alone or in conjunction with a discharge or discharges from other sources, both:

(1) Inhibits or disrupts the Publicly Owned Treatment Works, its treatment process or operations, or its sludge process, use or disposal, including preventing disposal by land application; and

(2) Therefore is a cause of a violation of any requirement in Calhoun's NPDES Permit, sewage sludge use or disposal, including preventing disposal by land application, is prohibited. 40 CFR 403.3(k).

Attachment E

The City of Calhoun, Georgia Code of Ordinances shall be revised at ARTICLE IV – SEWERS AND SEWAGE DISPOSAL in the following respects. **Additional language is underlined in bold font:**

**DIVISION 1. GENERALLY** shall be amended as follows:

**Sec. 94-141.- Definitions and abbreviations** to be amended to include the following definitions:

> ***PFAS* means per- and polyfluoroalkyl substances.**

**DIVISION 2. INDUSTRIAL DISCHARGE PERMITS AND REQUIREMENTS FOR INDUSTRIAL USERS** shall be amended as follows:

**Sec. 94-172.- Application for permit** shall be amended to include a new subsection (10) and (11) that provide as follows: [1]

> **(10)  Beginning with the 2026 permit cycle and all future permits for new sources or renewal permits, the form prescribed by the city shall include a requirement for the disclosure of the use, discharge, or suspected discharge of PFAS to the public sewer, and the city shall thereafter develop and prescribe appropriate pretreatment standards or best management practices (BMPs) to comply with this Sec. 94-172., including subsections (3), (8), and (9) above specifically as it relates to PFAS disclosed in the user's wastewater discharge to the sewer.**

> **(11)  Beginning with the 2026 permit cycle and all future permits for new sources or renewal permits, the city shall require all industrial users, including Significant Industrial Users, to include in industrial user permit applications for new sources or renewals of industrial user permits a report of such industrial user's (or Significant Industrial User's) Best Management Practices (BMPs) to eliminate or control discharges of PFAS to the public sewer, including product substitution, reduction, or elimination of PFAS, as detected by EPA's draft analytical method 1633 or a method consistent with 40 CFR Part 136 once such method is finalized by EPA. The city shall in turn evaluate and impose appropriate BMP permit conditions based on pollution prevention and source reduction opportunities that shall reasonably achieve the reduction or elimination of PFAS in the discharge to the public sewer, which may include (i) PFAS elimination or substitution when a reasonable alternative to using PFAS is available in the industrial process; (ii) Accidental discharge minimization by optimizing operations and good housekeeping practices; (iii) equipment decontamination or replacement where PFAS products have historically been used to prevent discharge of legacy PFAS following the implementation of product substitution that eliminates PFAS use in the industrial process employed by the industrial user.  (12) Beginning with the 2026 permit cycle and all future permits for new sources or renewal permits, the city shall**

---

[1] See EPA's PFAS NPDES Guidance, Section B.3.b.ii. (which calls on Wastewater Utilities to engage in pretreatment program activities including utilizing Best Management Practices and pollution prevention to address PFAS discharges to POTWs, with reference to the NPDES Guidance at Section A.3).

**consider and implement, where reasonable, the following BMP industrial user permit special conditions following the receipt of industrial user permit applications:**

      **i.**    **PFAS pollution prevention/source reduction evaluation: Within 6 months of the effective date of the permit, the industrial user (or Significant Industrial User) shall provide an evaluation of whether the facility uses or has historically used any products containing PFAS, whether use of those products or legacy contamination reasonably can be reduced or eliminated, and a plan to implement those steps.**

      **ii.**    **Reduction or Elimination: Within 12 months of the effective date of the permit, the industrial user (or Significant Industrial User) shall implement the plan in accordance with the PFAS pollution prevention/source reduction evaluation.**

      **iii.**    **Annual Report: An annual status report shall be developed which includes a list of potential PFAS sources, summary of actions taken to reduce or eliminate PFAS, any applicable source monitoring results, any applicable effluent results for the previous year, and any relevant adjustments to the plan, based on the findings.**

      **iv.**    **Reporting: When EPA's electronic reporting tool for DMRs (called "NetDMR") or Georgia EPD equivalent allows for the permittee to submit the PFAS pollution prevention/source reduction evaluation and the annual report, the example permit language shall read, "The pollution prevention/source reduction evaluation and annual report shall be submitted to Georgia EPD via its electronic reporting tool for DMRs (called "NetDMR")" or shall provide reasonably equivalent language in the pretreatment permit.**

**Sec. 94-192. - Periodic compliance reports** shall be amended to include a new subsection (d) that provides as follows:

**(d)**    **PFAS shall be included in reporting described in subsection (a) above, utilizing EPA Method 1633 or a method consistent with 40 CFR 136 once finalized by the Federal EPA.**

Attachment F

| Field ID | FieldName | Acres | LATITUDE | LONGITUDE | Address | Source | File_Bates | Page_Bates | PDF Pg. No. |
|---|---|---|---|---|---|---|---|---|---|
| 12.03 | GAGO 12-3 | 10.5 | 34.55 | -84.858333 | 2246 Roland Hayes Pkwy | 2014 NPDES Permit | EPD030448.pdf | EPD030490-EPD030491 | 43-45 |
| 12.04 | GAGO 12-4 | 11 | 34.486111 | -84.020833 | 2246 Roland Hayes Pkwy | 2014 NPDES Permit | EPD030448.pdf | EPD030490-EPD030491 | 43-45 |
| 15.07 | GAGO 15-7 | 33.2 | 34.576111 | -84.823056 | 954 Evergreen Road | 2014 NPDES Permit | EPD030448.pdf | EPD030490-EPD030491 | 43-45 |
| 19.01 | GAGO 19-1 | 10 | 34.405278 | -85.046389 | 186 Van Dyke Road | 2014 NPDES Permit | EPD030448.pdf | EPD030490-EPD030491 | 43-45 |
| 20.01 | GO 20-1 | 40 | 34.525 | -84.7725 | 588 Lick Creek Road | 2014 NPDES Permit | EPD030448.pdf | EPD030490-EPD030491 | 43-45 |
| 25.01 | GAGO25-1 | 22.7 | 34.441944 | -85.074722 | 4948 Roland Hayes Pkwy | 2014 NPDES Permit | EPD030448.pdf | EPD030490-EPD030491 | 43-45 |
| 4.4-4.6 | GAGO 4-4 thru 4-6 | 88.4 | 34.436111 | -85.090278 | 628 Battle Road | 2014 NPDES Permit | EPD030448.pdf | EPD030490-EPD030491 | 43-45 |
| 6.13-6.16 | GAGO 6-13 thru 6-16 | 91 | 34.583333 | -84.820278 | 1184 Evergreen Road | 2014 NPDES Permit | EPD030448.pdf | EPD030490-EPD030491 | 43-45 |
| 7.1-7.3 | GAGO 7-1 thru 7-3 | 24.5 | 34.476667 | -84.988889 | 572 Brown Farm Road | 2014 NPDES Permit | EPD030448.pdf | EPD030490-EPD030491 | 43-45 |
| 8.1-8.4 | GAGO 8-1 thru 8-4 | 31.7 | 34.588889 | -84.977778 | 751 Hyde Road | 2014 NPDES Permit | EPD030448.pdf | EPD030490-EPD030491 | 43-45 |
| 12.01-12.02 | GAGO 12-1& 12-2 | 54.5 | 34.486111 | -84.020833 | 2246 Roland Hayes Pkwy | 2014 NPDES Permit | EPD030448.pdf | EPD030490-EPD030491 | 43-45 |
| 13.01-13.05 | GAGO 13-1thru 13-5 | 49.3 | 34.409167 | -85.018611 | 281 Plainville Road | 2014 NPDES Permit | EPD030448.pdf | EPD030490-EPD030491 | 43-45 |
| 17.07-17.08 | GAGO 17-7 thru 17-8 | 39.4 | 34.564722 | -84.970278 | 1287 Hall Memorial Road | 2014 NPDES Permit | EPD030448.pdf | EPD030490-EPD030491 | 43-45 |
| 18.1-18.3 | GAGO 18-1thru 18-3 | 29.3 | 34.472222 | -84.843056 | 3449 Dews Pond Road | 2014 NPDES Permit | EPD030448.pdf | EPD030490-EPD030491 | 43-45 |
| 20.2-20.5 | GO 20-2 thru 20-5 | 21 | 34.530556 | -84.698889 | 355 Craig Road | 2014 NPDES Permit | EPD030448.pdf | EPD030490-EPD030491 | 43-45 |
| 21.1-21.3 | GO 21-1 thru 21-3 | 38.4 | 34.525833 | -84.781111 | 588 Lick Creek Road | 2014 NPDES Permit | EPD030448.pdf | EPD030490-EPD030491 | 43-45 |

| Field ID | FieldName | Acres | LATITUDE | LONGITUDE | Address | Source | File_Bates | Page_Bates | PDF pg. No. |
|---|---|---|---|---|---|---|---|---|---|
| 23.1-23.5 | GAGO 23-1thru 23-5 | 165.4 | 34.463889 | -85.991667 | 473 Reeves Station Road | 2014 NPDES Permit | EPD030448.pdf | EPD030490-EPD030491 | 43-45 |
| 24.1-24.5 | GAGO24-1 thru 24-5 | 70.3 | 34.455 | -85.076667 | 552 Rock Creek Road | 2014 NPDES Permit | EPD030448.pdf | EPD030490-EPD030491 | 43-45 |
| 25.2-25.4 | GAGO 25-2 thru 25-4 | 57.3 | 34.540278 | -85.133333 | 315 Water Tank Road | 2014 NPDES Permit | EPD030448.pdf | EPD030490-EPD030491 | 43-45 |
| 27.1-27.4 | GAGO 27-1thru 27-4 | 72.9 | 34.43 | -84.914722 | 440Johnson Lake Road | 2014 NPDES Permit | EPD030448.pdf | EPD030490-EPD030491 | 43-45 |
| 28.1-28.6 | GAGO 28-1thru 28-6 | 84.3 | 34.584167 | -84.818056 | 1263 Evergreen Road | 2014 NPDES Permit | EPD030448.pdf | EPD030490-EPD030491 | 43-45 |
| 29.1-29.4 | GAGO 29-1thru 29-4 | 39 | 34.562222 | -85.020278 | 1295 Sugar Valley Road | 2014 NPDES Permit | EPD030448.pdf | EPD030490-EPD030491 | 43-45 |
| 29.5-29.8 | GAGO 29-5 thru 29-8 | 13.7 | 34.610833 | -84.995 | 1753 Hill City Road | 2014 NPDES Permit | EPD030448.pdf | EPD030490-EPD030491 | 43-45 |
| 30.1-30.5 | GAGO 30-1 to 30-5 | 50.8 | 34.585556 | -85.047 | 1295 Mt. Loop Road | 2014 NPDES Permit | EPD030448.pdf | EPD030490-EPD030491 | 43-45 |
| 33.1-33.4 | GAGO 33-1thru 33-4 | 56.8 | 34.5125 | -84.839722 | 1551Love Bridge Road | 2014 NPDES Permit | EPD030448.pdf | EPD030490-EPD030491 | 43-45 |
| 34.1-34.2 | GAGO 34-1& 34-2 | 20.9 | 34.588889 | -84.834444 | 355 Greeson Road | 2014 NPDES Permit | EPD030448.pdf | EPD030490-EPD030491 | 43-45 |
| 9.1-9.5 | GAGO 9-1 thru 9-5 | 125 | 34.444444 | -84.941667 | 336 Salem Road | 2014 NPDES Permit | EPD030448.pdf | EPD030490-EPD030491 | 43-45 |
| 14.01-14.06 | GAGO 14-1thru 14-6 | 107.8 | 34.458333 | -84.859722 | 1924 Boone Ford Road | 2014 NPDES Permit | EPD030448.pdf | EPD030490-EPD030491 | 43-45 |
| 6.6-6.9 | GAGO 6-6 thru 6-9 | 99 | 34.544444 | -84.830556 | 678 Owens Road | 2014 NPDES Permit | EPD030448.pdf | EPD030490-EPD030491 | 43-45 |
| 11.01-11.02 | GAGO 11-1& 11-2 | 225 | 34.55 | -84.858333 | 944 Pine Chapel Road | 2014 NPDES Permit | EPD030448.pdf | EPD030490-EPD030491 | 43-45 |
| 11.03 | GAGO 11-3 | 212 | 34.548611 | -84.862778 | 944 Pine Chapel Road | 2014 NPDES Permit | EPD030448.pdf | EPD030490-EPD030491 | 43-45 |
| 11.04 | | 108 | 34.5467 | -84.8622 | | 2022 NPDES Permit (Form 2A) | | | 61 |

| Field ID | FieldName | Acres | LATITUDE | LONGITUDE | Address | Source | File_Bates | Page_Bates | PDF pg. No. |
|---|---|---|---|---|---|---|---|---|---|
| 11.05 | | 221 | 34.5417 | -84.8528 | | 2022 NPDES Permit (Form 2A) | | | 62 |
| 11.06 | | 104 | 34.5417 | -84.865 | | 2022 NPDES Permit (Form 2A) | | | 63 |
| 11.07 | GAGO 11-7 | 9 | 34.545833 | -84.851944 | 944 Pine Chapel Road | 2014 NPDES Permit | EPD030448.pdf | EPD030490-EPD030491 | 43-45 |
| 11.08 | GAGO 11-8 | 20 | 34.5325 | -84.880278 | 944 Pine Chapel Road | 2014 NPDES Permit | EPD030448.pdf | EPD030490-EPD030491 | 43-45 |
| 11.09 | | | 34.532 | -84.876 | | 2022 NPDES Permit (Form 2A) | | | 86 |
| 11.1 | | | 34.532 | -84.872 | | 2022 NPDES Permit (Form 2A) | | | 58 |
| 11.11 | | | 34.536 | -84.871 | | 2022 NPDES Permit (Form 2A) | | | 72 |
| 11.12 | GAGO 11-12 | 32.2 | 34.563889 | -84.863333 | 1603 Pine Chapel Road | 2014 NPDES Permit | EPD030448.pdf | EPD030490-EPD030491 | 43-45 |
| 20.06 | | | 34.5405 | -84.8327 | | 2022 NPDES Permit (Form 2A) | | | 84 |
| 22.01-22.21 | | 40 | 34.55 | -84.8056 | | 2011 & 2014 Biosolids Annual Reports | | | |
| 26.01-26.03 | | | 34.417 | -85.013 | | 2022 NPDES Permit (Form 2A) | | | 66-68 |
| 6.1-6.5; 6.10-6.12 | GAGO 6-1 thru 6-12 | 17 | 34.583333 | -84.833333 | 1184 Evergreen Road | 2014 NPDES Permit | EPD030448.pdf | EPD030490-EPD030491 | 43-45 |
| 6.17-6.19 | GAGO 6-17 thru 6-19 | 160.7 | 34.534722 | -84.840278 | 1223 Hunts Gin Road | 2014 NPDES Permit | EPD030448.pdf | EPD030490-EPD030491 | 43-45 |
| 6.20-6.22 | GAGO 6-20 thru 6-22 | 115.6 | 34.585556 | -84.846667 | 0 Baxter Road | 2014 NPDES Permit | EPD030448.pdf | EPD030490-EPD030491 | 43-45 |
| 10.01-10.07 | GAGO 10-1thru 10-7 | 157 | 34.470833 | -84.840278 | 2583 Boone Ford Road | 2014 NPDES Permit | EPD030448.pdf | EPD030490-EPD030491 | 43-45 |
| 15.01-15.06 | GAGO 15-1thru 15-6 | 66 | 34.584722 | -84.83333 | 1184 Evergreen Road | 2014 NPDES Permit | EPD030448.pdf | EPD030490-EPD030491 | 43-45 |

| Field ID | FieldName | Acres | LATITUDE | LONGITUDE | Address | Source | File_Bates | Page_Bates | PDF pg. No. |
|---|---|---|---|---|---|---|---|---|---|
| 16.01-16.07 | GAGO 16-1thru 16-7 | 56 | 34.561111 | -84.990278 | 683 Fairview Road | 2014 NPDES Permit | EPD030448.pdf | EPD030490-EPD030491 | 43-45 |
| 17.01-17.06 | GAGO 17-1thru 17-6 | 60.9 | 34.576111 | -84.9825 | 1347 Resaca Lafayette Hwy | 2014 NPDES Permit | EPD030448.pdf | EPD030490-EPD030491 | 43-45 |
| 31.1-31.3 | GAGO 31-1thru 31-3 | 42.1 | 34.586944 | -84.838056 | o Greeson Road | 2014 NPDES Permit | EPD030448.pdf | EPD030490-EPD030491 | 43-45 |



2 Mile Zones for All Former or Currently Approved Land Application Sites with data for biosolid application quantities Overlain on Approved Sites From City of Calhoun figure